

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

08 APR 30  PM 3:59

CLERK U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE FLORIDA

UNITED STATES OF AMERICA ex rel., TERRY
L. MYERS, Relator,

       Plaintiff, and

STATE OF FLORIDA ex rel., TERRY L.
MYERS,

       Plaintiff,

vs.

SHANDS HEALTHCARE d/b/a SHANDS AGH,
SHANDS JACKSONVILLE HEALTHCARE,
INC., SHANDS JACKSONVILLE MEDICAL
CENTER, INC., SHANDS TEACHING
HOSPITAL AND CLINICS, INC. a/k/a "SHANDS
AT THE UNIVERSITY OF FLORIDA",
SHANDS AT LAKESHORE, INC., SHANDS
LIVE OAK, SHANDS STARKE,

       Defendants.

CASE NO.: 3:08-CV-441-J-16HTS

**FILED UNDER SEAL**

**[FALSE CLAIMS ACT –QUI TAM]**

## COMPLAINT

    **COMES NOW**, TERRY L. MYERS, ("Relator") in the above-styled action, by and

through his counsel of record, and states this is an action brought on behalf of the United

States of America and the State of Florida by Relator against SHANDS HEALTHCARE, a

healthcare system network of hospitals, consisting of   SHANDS AGH, SHANDS

JACKSONVILLE HEALTHCARE, INC., SHANDS JACKSONVILLE MEDICAL

CENTER, INC., SHANDS TEACHING HOSPITAL AND CLINICS, INC. a/k/a "SHANDS

5-1

AT THE UNIVERSITY OF FLORIDA",   SHANDS AT LAKESHORE, INC., SHANDS

LIVE OAK, SHANDS STARKE, and affiliated entities, (hereinafter sometimes collectively

referred to as "SHANDS") pursuant to the Qui Tam provisions of the Civil False Claims Act,

31 U.S.C. § 3729-33 and pursuant to pendent jurisdiction, the Florida False Claims Act,

68.081 **et. seq.**

**JURISDICTION AND VENUE**

     1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and

31 U.S.C. § 3732(a) and 3730(b).  This Court has jurisdiction to entertain a qui tam action.

Relator is an "original source" and otherwise authorized to maintain this action in the name

of the United States as contemplated by the Civil False Claims Act, 31 U.S.C. § 3729-33.

     2.     Venue is appropriate as to each Defendant, in that one or more of Defendants

can be found in, reside in, and/or transact business in this judicial district.  Additionally, acts

proscribed by 31 U.S.C. § 3729 have been committed by one or more of the Defendants in

this judicial district. Within the meaning of 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a),

venue is proper.

     3.     Relator has made voluntary disclosures to the United States Government prior

to the filing of this lawsuit and has filed a Disclosure Statement with the United States

Government as required by 31 U.S.C. § 3730(b)(2).  Disclosures have or will be made to the

State of Florida upon the filing of this action.

4.     This court has pendent jurisdiction as to claims asserted by Relator on behalf of the State of Florida under Florida's False Claims Act (Fla. Statute §§68.801-68.09) pursuant to 28 U.S.C. § 1367.

## THE PARTIES

5.     Plaintiff TERRY L. MYERS is a citizen of the United States of America. Relator is a resident of the State of Indiana. He brings this *qui tam* action based upon direct and unique information obtained during Relator's employment with YPRO CORPORATION, an Indiana corporation founded by Relator.  As characterized by the False Claims Act, Plaintiff will be referred to as "Relator" hereafter.

6.     Defendants are members of SHANDS HEALTHCARE system, a nine hospital network system, affiliated with Florida Health Science Center and the University of Florida. The corporate members of this network are Florida corporations. The names of the network defendants are as follows:   SHANDS AGH, SHANDS JACKSONVILLE HEALTHCARE, INC., SHANDS JACKSONVILLE MEDICAL CENTER, INC., SHANDS TEACHING HOSPITAL AND CLINICS, INC. a/k/a "SHANDS AT THE UNIVERSITY OF FLORIDA",  SHANDS AT LAKESHORE, INC., SHANDS LIVE OAK and SHANDS STARKE.

7.     These defendants transact business in the State of Florida as not for profit entities and one of their principal geographic areas of service is within the Middle District of Florida.

8.    The registered agent for the following defendants is Charles E. Caniff, 655 West 8th Street, Jacksonville, Florida 32209:

(a)    SHANDS AGH, ("AGH") whose principal location is at 801 SW 2d Ave, Gainesville, Florida 32601; AGH is a 367 bed full service hospital;

(b)    SHANDS JACKSONVILLE HEALTHCARE, INC.("JAX"), whose principal office is 655 West 8th Street, Jacksonville, Florida 32209; JAX is a 584 bed short term acute care facility;

(c)    SHANDS JACKSONVILLE MEDICAL CENTER, INC., whose principal address is 655 West 8th Street, Jacksonville, Florida 32209;

(d)    SHANDS TEACHING HOSPITAL AND CLINICS, INC. a/k/a "SHANDS AT THE UNIVERSITY OF FLORIDA" ("UF"), whose principal office is 1600 SW Archer Road, Gainesville, Florida 32608; UF is a 923 bed hospital with 22,000 Medicare/Medicaid patient discharges annually;

(e)    SHANDS AT LAKESHORE, INC. ("LAKESHORE"), whose principal address is 368 Franklin Street, Lake City, Florida 32055; LAKESHORE is a 99 bed short term acute care facility;

(f)    SHANDS LIVE OAK ("LIVE OAK"), whose principal office is 1100 Southwest 11th Street, LIVE OAK, Florida 32064; LIVE OAK is a 15 bed critical access facility; and

(g)    SHANDS STARKE ("STARKE"), whose principal office is 922 East Call Street, STARKE, Florida 32091; STARKE is a 25 bed critical access facility.

4

## STATUTORY BACKGROUND

9.     The Medicare Program (hereinafter "Medicare") is a Health Insurance Program administered by the Government of the United States that is funded by taxpayer revenue. The Medicare Program is directed by the United States Health and Human Services Department. The Program was designed to assist participating states in providing medical services and durable medical equipment to persons over sixty-five (65) years of age and certain others that qualify for Medicare.

10.     The Medicaid Program ("Medicaid") is a Health Insurance Program administered by the Government of the United States that is funded by State and Federal taxpayer revenue. It is overseen by the United States Health and Human Services Department. Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially-needy individuals that qualify for Medicaid.

11.     TRICARE/CHAMPUS is a federally-funded program that provides medical benefits, including hospital services, to (a) the spouses and unmarried children of (1) active duty and retired service members,  and (2) reservists who were ordered to active duty for thirty days or longer; (b) the unmarried spouses and children of deceased service members; and (c) retirees.

12.     Wherever appropriate, Medicare, Medicaid and TriCare/Champus and all other Federal and State payors will be collectively referred to as "Government Payors".

## RELATOR BACKGROUND INFORMATION

13.     Relator, Terry L. Myers, is the founder and president of YPRO Corporation ("YPRO"). YPRO's corporate headquarters are located at 1905 Aquarius Drive, Corydon, Indiana.

14.     YPRO is a nationwide healthcare consulting firm that was founded in 1986 by Relator as to response to the implementation of the Medicare DRG Regulator System. His former experience as a healthcare consulting manager with Coopers & Lybrand provided him with a unique understanding of proper coding and reimbursement practices as well as audit techniques.

15.     Over the last 22 years, YPRO has helped hundreds of hospitals understand how to acquire the legal reimbursement due to them through reviews and tailored educational and coding sessions.   Some of the primary services provided by YPRO to health care provider clients are coding audits, medical necessity audits and clinical documentation improvement audits.

## HISTORY OF THE YPRO
## RELATIONSHIP WITH SHANDS

16.     In April, 2006, a request for proposal was sent by Shands to YPRO.  The Shands Corporate Compliance Department was seeking assistance in conducting on-site reviews at Shands Jacksonville (JAX), Shands Gainesville (UF), Shands AGH (AGH), Shands LAKESHORE (LAKESHORE), Shands STARKE (STARKE) and Shands LIVE OAK (LIVE OAK).

6

17.     The request for proposal sought Medicare payor review and Commercial payor review for both observation services and one-day inpatient stays.

18.     The observation service ("OBS") review specifically requested coding, billing and documentation quality assessments.  OBS services are billed in specifically calculated units of time.  Accurate systems must be in place to document when a bed is provided to a patient and the time a patient is discharged or over-billing can occur.

19.     The one-day inpatient stay review was requested by Shands to determine if inpatient admissions met inpatient Medicare criteria.  In order to be paid for inpatient services, a provider must document the appropriate medical necessity criteria that satisfies both severity of illness (SI) and intensity of service (IS) requirements for an inpatient admission.  In addition to the IS and SI requirements, a proper physician admit and discharge order must be present and signed, dated and timed.  Due to the greater reimbursement for inpatient services (versus OBS services), the Government requires strict adherence to inpatient admission rules.

20.     The date review range for the 2006 YPRO audits was the first quarter of 2006 which consisted of January, February and March, 2006.

21.     The audits were designed to include the review of a minimum of 30 Medicare patient records and claims at each of the six facilities for both the inpatient review as well as the observation review.

22.     The closing date for submitting bid responses by YPRO to the Shands request for proposals was May 5, 2006.  Proposed interview dates for audit candidates were scheduled for May 18, 2006.

7

23.    In May of 2006, discussions commenced between YPRO and Shands regarding the details of the requested observation reviews and the one-day stay admission reviews for each of the six separate defendant facilities owned and controlled by Shands as identified previously.

24.    Lance Bradley was the Interim Chief Compliance Officer for Shands in May, 2006.  He was directly involved in the communications and negotiations with YPRO for the 2006 observation review and one-day admissions review.  Interim Chief Compliance Officer Bradley reported to YPRO that Shands had never undergone an observation review or a one-day admission review to the best of his knowledge prior to that time.  He told Relator that when he became Interim CCO, he looked at the status of the Shands compliance efforts and found the one-day stay and OBS areas to be among the most deficient at Shands.  He asked YPRO to assist him in verifying and quantifying those compliance deficiencies.

25.    Contract negotiations were successfully concluded and an agreement was signed between YPRO and Shands near the end of June, 2006.  The contract was executed on behalf of Shands by Lance Bradley as Interim Chief Compliance Officer.

26.    Pursuant to the terms of the contract, YPRO was obligated to review documentation provided by the six Shands facilities relating to several key areas of inquiry. YPRO was hired by Shands to look at the accuracy and completeness of documentation, accuracy of coding related to medical necessity, the accuracy of the number of units charged for observation time, the accuracy of the admission criteria and the accuracy of inpatient-to-observation-status change and condition code usage.  To ensure accuracy of the Medicare patient claims, it was agreed that a RAT-STATS sampling process would be used to select

the claims for audit.   A copy of that contract has been provided to the Government by Relator.

## THE 2006 AUDITS

27.     Pursuant to the contract, YPRO began to audit the records for six Shands facilities in July, 2006.  The six audits were completed by mid-August, 2006.

28.     The on-site reviews were conducted by a YPRO team of professionals.  The on-site review team was headed by Susan Von Kirchoff, M.Ed., RHIA, CCS, CCS-P, CCP. Ms. Kirchoff was Vice President of Operations for YPRO.

29.     She was assisted in the 2006 on-site review by LaNiece Sharpling, LPN, CCS, Coding and Documentation Specialist and Kirsten Johnson, BSN, RN, RHIT Documentation Specialist.  Sharpling, Johnson and Kirchoff comprised the YPRO audit team that performed the 2006 on-site Shands reviews described hereafter.

30.     The information gathered as a part of the on-site audit was also reviewed and analyzed by Relator as President of YPRO.  Relator has a Bachelor of Science degree with dual majors in Quantitative Analysis and Business Administration.

31.     The first Shands facility that was audited was AGH in Gainesville, Florida. AGH is a 367 bed facility that receives tens of millions of dollars in Medicare and Medicaid revenues per year.

32.     From the very start of the audits at AGH, it became very apparent to the YPRO team and Relator that serious billing, coding and compliance issues were occurring at AGH on a daily basis.

9

33.     The 2006 audit of AGH revealed that the case managers were not correctly applying severity of illness (SI) and/or intensity of service (IS) criteria required to justify an impatient admission.  Additionally, the YPRO team discovered that a large number of cases reviewed did not have proper admission orders or were otherwise legally deficient.

34.     Similarly, the observation review revealed that there were a large number of observation (OBS) patients which had been improperly coded and billed.  This resulted in a high number of OBS units being over-billed to Government payors such as Medicare and Medicaid.

35.     At AGH, the 2006 audit revealed that one of the most serious problems dealt with billing compliance accuracy.  Only 13% of the OBS bills examined at AGH as a part of the 2006 audit complied with the applicable regulatory requirements.  Both inpatient and OBS deficiencies at Shands had a substantial and negative impact on Medicare, Medicaid, Champus, TriCare and other government payors ("Government Payors").  The 2006 audit proved that a large number of false claims were submitted to Government Payors on a daily basis.  Copies of the back-up data and records which prove the false claims did in fact occur at AGH have been provided to the Government by Relator.

36.     As contemplated in the contract between YPRO and Shands, the YPRO team scheduled an exit meeting at AGH at the conclusion of the on site audit.  From YPRO's perspective, the purpose of the meeting was to go over the results of the on-site audit, answer questions about the process and results, and determine if Shands wanted to avail itself of additional education and training that could be provided by YPRO or other third parties to address the compliance and billing deficiencies revealed at AGH during the OBS and

10

admissions audits.

37.     In August, 2006, the AGH exit meeting was scheduled and conducted by Ms. Kirchoff. The Shands Interim Chief Compliance Officer, as well as AGH upper management representatives including department heads and its chief financial officer were present for the exit meeting.

38.     A number of things transpired during the 2006 AGH exit meeting which greatly concerned Ms. Kirchoff. She immediately reported her concerns directly to Relator. The Shands upper management and department heads who were present in the exit meeting made a number of comments about "going to jail and wearing striped jumpsuits" before and during the presentation of the audit results. Ms. Kirchoff reported that she observed what was described by her to Relator as being "nervous laughter" during the meeting when the Shands attendees were commenting on the criminality of the Shands conduct at issue.

39.     At the AGH exit meeting, a specific breakdown of the billing and coding errors detected by separate payor type was provided to the attendees. For example, both Medicare and Medicaid error summaries detected during the 2006 audit were provided to the Shands attendees. The Shands attendees openly acknowledged the absence of any legitimate case management (CM) protocols in place at AGH. The absence of CM led to perpetual billing and coding errors.

40.     The Shands upper level management acknowledged that the system in place at that time (August, 2006) had been in place for many years. Several attendees stated that they were aware of the compliance problems at AGH prior to the YPRO audit. None of the Shands employees at the exit meeting verbalized any surprise at the billing or coding errors

11

discovered in the 2006 audit.

41.     Immediately after the meeting, Ms. Kirchoff contacted Relator and provided a report as to what had transpired.  She told Relator about the flippant responses and admissions made by the Shands upper management regarding the jail sentences and illegality of the billing and coding systems in place at AGH.  She was upset and concerned about the other (5) exit meetings planned for the other Shands facilities in the next few weeks.

42.     About the time of the AGH exit meeting, YPRO and Relator were in the process of reviewing data at other Shands facilities.  They learned that the problems discovered at AGH were systemic and present in the other facilities as well.  The Relator's concerns were intensified because the Shands data reviewed by YPRO involved false paid claims as opposed to false claims that were billed but not paid.  It was readily apparent that the absence of Medicare/Medicaid compliance at Shands was costing the Government many millions of dollars each year.

43.     Shortly after the AGH exit meeting, discussions ensued between Ms. Kirchoff, Relator and the Shands Interim Chief Compliance Officer about changing the open format for the other five exit meetings yet to occur at JAX, UF, STARKE, LIVE OAK and LAKESHORE.

44.     Mr. Bradley indicated that he did not want to have another exit meeting where any type of a YPRO presentation was made to a group of Shands' employees regarding the findings of the 2006 audit.  He was displeased with the openness of the AGH exit meeting and the statements and admissions made there by the Shands attendees.  For the other five facilities, Bradley specifically changed the exit meeting format so the YPRO team would

meet separately with coders and case managers from the other five facilities to go over "individual records" without any group discussion of YPRO's 2006 audit summary findings. Open meetings with statements about "going to jail and wearing striped jumpsuits" are risky events which a Chief Compliance Officer does not want to replicate.

45.     In that vein, a conference call with Lance Bradley shortly after the exit meeting at AGH, Relator expressed his concerns in the strongest terms possible. Relator indicated that there was significant evidence of fraud in the Shands patient and billing records audited by YPRO. Lance Bradley and Relator discussed the possibility of a "whistleblower" as a result of the open discussions and candid admissions made by the attendees regarding the high Medicare and Medicaid error rates at Shands.

46.     Unfortunately for the taxpayers, the 2006 YPRO audits for OBS and one-day stays at JAX, UF, LAKESHORE, STARKE and LIVE OAK revealed that the same frequent fraudulent billing and coding practices existed at those five facilities as those outlined above at AGH. Blatant medical necessity errors and/or documentation and coding errors were uniformly found in the patient records at each of the six Shands facilities.

47.     The 2006 audit of inpatient services related to one-day stays revealed substantial and pervasive medical necessity errors at all six facilities that resulted in improper inpatient admissions. A high percentage of the Medicare patient charts for inpatients that were audited revealed a lack of sufficient severity of illness (SI) or intensity of service (IS) to justify an inpatient admission. The audit also uncovered the absence of even minimal levels of the physician documentation in the patient records required before a bill can be submitted to a Government Payor.

48.     The error rate for the 148 Medicare inpatient records was found to be 53%.

49.     Incredibly, the medical necessity error rate for the Medicaid patients was even higher.  The Medicaid total inpatient error rate was found to be 78%.  Back-up data supporting these error rates has been provided to the Government by Relator.

50.     The 2006 audit revealed repetitive and systemic occurrences of over-billing involving OBS as well.  The over-billing for observation hours was caused by a number of problems found to exist at the Shands facilities.  Admit/Discharge orders were found to be defective or missing altogether.  There was a systemic problem with the absence of signed orders.  There was a systemic problem with the absence of the designation of the bed/service provided and the miscalculation of OBS hours by Shands staff.  All of these deficiencies negatively impact OBS billing compliance.

51.     By way of example, UF had only a 3% OBS billing compliance accuracy rate in 2006; that equates to a 97% error rate.  JAX had the highest OBS billing compliance accuracy of 27%.  Therefore, JAX's error rate for billing compliance accuracy, though the best in the Shands system, still revealed a 73% error rate.

52.     One of the most disturbing discoveries that occurred during the 2006 audit was the total absence of any CM protocols in three of the six Shands facilities!  JAX, LAKESHORE and LIVE OAK had no legitimate case managers or CM protocols whatsoever in place to ensure compliance with the applicable Government Payor guidelines.  The absence of legitimate CM protocols is a primary catalyst for many of the fraudulent practices uncovered at each of the Shands facilities that will be discussed in detail within this Complaint.

14

53.    With no CM protocols to check the appropriateness of inpatient admissions close in time to the admissions, medical necessity and physician documentation errors occurred with great frequency.  Without CM reviews or valid CM protocols to authenticate Medicare/Medicaid admissions, there were significant errors in the Government Payor inpatient population beyond the "one day stay" population.

54.    Three of the Shands facilities, on paper, claimed to have a viable CM program, but two of these facilities followed no appropriate CM protocols nor adhered to any legitimate written protocols to validate inpatient admissions or medical necessity.  AGH and UF had no legitimate CM protocols in place.  Based upon the charts audited, to the extent that there was any review done at all with regard to the appropriateness of the inpatient admission, it misapplied the proper IS/SI criteria and routinely failed to validate that a correct order for treatment existed.

55.    To the extent that Shands claims that the CM function was being handled by utilization review (UR), that would be a false statement.  The handling of CM functions by UR was a failure and violated the law for a number of reasons.  YPRO found that the UR, if it occurred at all, routinely occurred after the discharge and after the Government Payors had already been billed.  The excess payments received by Shands for inappropriate admissions without medical necessity were not returned or otherwise credited back to the Government Payors.  The UR staff simply noted "NA" or "not applicable" when SI or IS criteria was not met.

56.    The UR at Shands facilities were not following any legitimate CM protocols.  The InterQual CM system was available to the Shands facilities but it was not effectively

15

implemented or used.  In fact, in many Medicare patient records, even where the UR did determine that there was insufficient SI or IS to justify an inpatient admission, the admission status of the patient was never changed and Government Payors were inexplicably billed for the inpatient admission.  That over-billing, despite internal confirmation that the charges were inappropriate, shows an absence of CM protocol and a deficient UR process.

57.     By way of example, the 2006 audit uncovered a number of patient entries where SI or IS deficiencies were documented only to have the notation "medical necessity – not applicable" shown on the patient record because the patient had already been discharged and the Government Payor already billed before the UR was conducted.  The requirement that medical necessity be established before admitting and billing a Government Payor is never "not applicable".  This notation reflects a total lack of understanding of proper CM or UR.

58.     Again, it bears emphasizing that no legitimate CM protocol was utilized as a part of a CM review or UR at Shands.  This fact taints the legality of every impatient admission and potentially all of the OBS charges as well.

59.     Moreover, a functioning UR and a UR committee is a condition of participation in the Medicare program.  At JAX, UF, AGH, LAKESHORE and LIVE OAK there was a breakdown of CM and UR at every level.  The net effect of this breakdown was the total absence of compliance oversight and involvement as required by Medicare and Medicaid.

60.     The only semblance of a functioning CM protocol existed at the very small STARKE facility.  STARKE is a 25 bed critical access facility.  In contrast to the other five

Shands facilities, STARKE appeared to have a working CM because the audit results showed that the STARKE inpatient admissions met medical necessity requirements.  However, that one piece of seemingly positive news was seriously tainted when the YPRO team was told by STARKE Utilization Manager (UM) Linda DiPaolo that the STARKE "case managers had the authority to change a physician's order" in order to appropriately admit the patient as an inpatient or into observation status.  This protocol is bizarre and illegal.  A hospital must have a valid <u>physician order</u> to treat the patient or bill the Government.  Relator has provided the UM protocol and notes from the DiPaolo interview to the Government.

61.     The fact that STARKE had illegal protocols in place as a part of its CM and UR establishes that all six of the Shands hospitals had major problems with CM and UR. CM and UR systems are costly and by definition can cut reimbursement.  A trained CM staff and a physician advisor must be present to have a legitimate CM or UR.  Shands opted to recklessly disregard its duty to establish and utilize legitimate CM or UR functions at all six facilities.

62.     At the other five offending Shands facilities (JAX, AGH, UF, LIVE OAK and LAKESHORE), there was no institutional commitment to compliance or UR regarding the appropriateness of Medicare or other Government Payor charges.  The CM performance at these facilities was not evaluated internally by Shands for quality.  Insufficient criteria were in place to ensure effective CM protocols.  Even in cases where a review was done and CM or UR determined that there was no medical necessity, that information was not used and some claims were billed to the Government Payor anyway.  This truth reveals a total absence of Shands corporate oversight and the total failure of Shands to establish a viable compliance

program.

63.     In summary, the total absence of any CM at three facilities (JAX, LAKESHORE and LIVE OAK) shows a complete breakdown at the CM level and explains the perpetual failure of Shands to ensure the legitimacy of claims billed to Medicare and Medicaid. At UF and AGH, there were no legitimate CM or UR protocols in place, although they did have case managers, to determine the appropriateness of the inpatient admissions for one-day stays as well as all other Government Payor admissions such as longer inpatient stays. At the tiny critical access facility at STARKE, the UM protocol allowed nurses to change physician orders in determining a patient's status.

64.     The reckless disregard for proper CM or UR protocols discussed herein violated a major condition of participation in the Medicare program. In response to a written question from YPRO on July 4, 2006, Shands acknowledged that only two of its facilities are using InterQual criteria to allegedly determine the appropriateness of admission. Shands claimed that UF and AGH were using InterQual. However, as stated above, the 2006 audit revealed that the InterQual was not being effectively used at either UF or AGH to determine appropriateness of admission. Only STARKE, the small 25 bed critical hospital was utilizing InterQual, but that fact was jaded by the discovery that CM nurses were applying the InterQual criteria independent from the physicians.

65.     Shands wrote to YPRO and said that JAX used InterQual for a short trial at one point, but that JAX no longer used that system. "Shands JAX – No. We stopped using the CM protocol when the pilot ended. We review the admission order and if we disagree we contact the physician for a verbal order to change the status." The email supporting this

statement has been provided to the Government by Relator.

66.     The Shands response reflects an ineffective protocol. The determination as to appropriateness of admission should be conducted near in time to the admission. A protocol must be set up where both SI and IS criteria are evaluated to establish medical necessity and determine that correct and complete physician orders and documentation exist prior to billing the Government Payors. The 2006 audit found very little evidence of any CM or UR activity whatsoever that was used to insure compliance with Medicare or Medicaid regulations.

67.     There was no evidence that billing for an inappropriate inpatient admission was adjusted after discharge. In many cases where a medical necessity issue was identified, the patient had already been discharged and the determination of medical necessity was deemed moot because Shands had already billed the Government Payors.

68.     All of the above CM and UR deficiencies increased the error rates for the Shands OBS patients in a fashion similar to the impact on inpatient error rates discussed above. Specifically, the 2006 audit revealed that the average accuracy rate determined for Medicare OBS patient files was only 5.8%. Thus, the applicable error rate was 94.2% for OBS patients audited for accuracy. In arriving at this 94.2% error rate, 182 Medicare patient files were randomly audited. This result means that the Government is being defrauded on a grand scale.

69.     The same CM/UR deficiencies discussed above also contributed to exorbitant error rates for Medicaid OBS patients as well. The accuracy for Medicaid OBS patients was calculated to be 22%. Accordingly, the error rate for Medicaid patients was 78%.

70.     Copies of the patient records and worksheets utilized by YPRO in conducting

the six site audits at the Shands facilities in 2006 have been provided to the Government by Relator.

71.     The RAT-STATS sampling of Medicare/Medicaid patients for the six Shands facilities revealed hundreds of false claims submitted to Government Payors by Shands during the first quarter of 2006. The RAT-STATS sampling was of sufficient size and integrity to support the Relator's allegation that additional thousands of false claims were submitted to Government Payors during the same period of time for all the reasons set forth above.

72.     After the AGH exit meeting and after the audits were completed at the other five sites, exit meetings were conducted at JAX, UF, LAKESHORE, LIVE OAK and STARKE. These exit meetings were handled by YPRO representatives and attended by Shands coders or case managers. No summary audit information was provided to the Shands employees at the five exit meetings as per Lance Bradley. To the contrary, the exit meetings were limited to discussions of individual patient records.

73.     Conversely, the complete results of the 2006 one-day stay review and OBS review were provided in draft, preliminary and final form to Shands at a high corporate level through its interim Chief Compliance Officer.

74.     A YPRO document titled "2006 – EXECUTIVE SUMMARY ALL FACILITIES" was provided to Shands which outlines the details of the YPRO audit findings for all facilities. Overall results and recommendations were provided. Areas of quality improvement for OBS and inpatient services were provided. Graphical analysis was provided.

75.     The 2006 Executive Summary that YPRO delivered to Shands contained site-specific audit results and recommendations. Each of the six facilities received specific audit results that outlined the nature and frequency of inpatient and outpatient billing and coding errors detected by YPRO.   The 2006 Executive Summary included a notation that adjustments should be submitted by Shands for all over-billing identified in the 2006 audit.

76.     Each facility received written materials and charts which described the OBS errors, medical necessity errors, coding accuracy errors, physician-order documentation errors and CM protocol deficiencies on a payor-by-payor basis.

77.     Shands received a breakdown of the errors affecting Medicare patients which was separate from the breakdown for the errors discovered regarding commercial/managed care, Medicaid, high-risk or concurrent payor types.   Shands also received information specific to the Medicaid-related errors that were found in the audit.

78.     The bottom line is this – the very serious fraudulent abuses found to exist at all of the Shands facilities were documented in plain terms with e-logs, back-up data and audit result support to the Shands Interim Chief Compliance Officer and the Shands upper-level management in August of 2006.  Copies of the Executive Summary and facility-by-facility audit work performed by YPRO have been provided to the Government by Relator.

79.     In September, 2006, shortly after the Executive Summary and results were provided to Shands, YPRO offered quotes to Shands for future medical necessity training and for other forms of needed coding and compliance education that YPRO could provide to Shands.

80.     Shands rejected the YPRO offers for training and education.  Lance Bradley told Relator that "we'll do our own corrective action plan internally."

81.     Sandra Bell and Lance Bradley were the primary Shands contacts for the 2006 audit conducted by YPRO.  Sandra Bell was a Billing Compliance Specialist within Shands Corporate Compliance Office in Gainesville, Florida.  Ms. Bell was involved in coordinating the facility audits and in scheduling the exit meetings discussed above.  On or about November 20, 2006, Sandra Bell provided a copy of a Shands "action plan" that was allegedly drafted by Shands internally to be responsive to the 2006 audit findings of YPRO.

82.     Sandra Bell told YPRO that the internally drafted action plan had been sent by Shands to each of the six Shands facility administrators for review and implementation.

83.     A copy of the memo from Ms. Bell titled "Action Plan and Next Steps for the Observation and One-Day Stay Audit Findings" was provided to the Government by Relator.

84.     Under the proposed action plan, with regard to reacting to the overall findings of the YPRO audit, the administrators were given thirty days to put a team together and submit a corrective action plan.  Lance Bradley was to review the plan to ensure that identified issues in the YPRO audit were addressed within fifteen days.  Once the action plan was approved, the administrators would have thirty days to implement.  Additionally, a date was targeted for a second audit as a follow-up review to the 2006 audit.  The 2007 audit was scheduled to commence in April, 2007 as per the action plan.

85.     As to the "risk identification of the alleged errors resulting in over-billing and under-billing", the Shands action plan stated that all of the claims and encounters identified with financial impact for an adjustment in the YPRO 2006 audit would be adjusted within

sixty days of the approval of the corrective action plan referenced above in paragraph 84.

86.     After receiving a copy of the proposed Shands action plan, Relator was initially somewhat relieved because the Shands internal action plan made reference to making the appropriate "adjustments" for over-payments identified in the 2006 audit. Relator's initial optimism faded over the next six months as neither YPRO nor Relator ever saw any indication that Shands followed through with the terms of its own proposed action plan by refunding some or any of the over-payments identified in the 2006 audit.

87.     Lance Bradley said that YPRO had done a thorough job in the 2006 audit and he wanted YPRO to handle the contemplated 2007 audit.  Negotiations commenced again between Shands and YPRO in late 2006 which resulted in a verbal agreement that YPRO would perform a second audit for Shands to begin in April of 2007.

## THE 2007 AUDITS

88.     In December, 2006, a second written YPRO/Shands agreement for a follow-up on-site OBS and one-day audit was drafted and revised according to instructions provided by Shands.

89.     On January 8, 2007, Relator, Susan Kirchoff and Lance Bradley had an important telephone conversation.  Ms. Kirchoff's notes on that conversation support the Relator's recollection exactly as to the substance of the conversation.

90.     Mr. Bradley was told that YPRO does not provide legal advice to clients. However, Relator did make specific recommendations to Shands to self-disclose to the Government Payors due to the high error rates applicable to Medicare, Medicaid and

23

TriCare/Champus patients found in the 2006 audit.

91.     Lance Bradley stated that he would defer the decision for self-disclosure to his general counsel at Shands. The general counsel at Shands was not a part of the conversation. During that conversation, Relator again reiterated to Mr. Bradley that he felt that a self-disclosure was necessary and that fraudulent billing had occurred and was occurring on a very regular basis at the Shands facilities audited thus far.  Bradley did not argue or disagree with Relator's statement.

92.     Approximately one month after the January 8, 2007 conference referenced above, a contract was signed between YPRO and Shands setting forth the terms of a second audit.  The 2007 audit was being conducted specifically to re-assess the overall accuracy of the Shands billing and coding for one-day stays and OBS services.  It was determined that the audit would commence on April 16, 2007.  The 2007 YPRO audit team was made up of Susan Kirchoff, LaNiece Sharpling and Rebecca Dehart.

93.     Relator became concerned when he did not hear back from Shands with regard to any self-disclosure actions relating to the over-billing detected in the 2006 audit during the first three months of 2007.  Relator expected to be contacted, in due course, by Shands with regard to Shands' self-disclosure since YPRO had handled the audit and would be in the best position to make specific recommendations about the appropriate adjustments. A Shands self-disclosure was never mentioned again to Relator or YPRO after Relator's January 8, 2007 conference call with Lance Bradley where Relator told Mr. Bradley that a self-disclosure by Shands was needed.

24

94.     As inferred above, neither Relator nor anyone at YPRO subsequently saw any evidence that any self-disclosures were made by Shands to any Government entity at any time.

95.     Just before the April, 2007 audits were to commence, Lance Bradley was replaced at Shands.  Relator does not know if Bradley was fired.

96.     The reasons for Bradley's departure were not shared with Relator or YPRO. Since it was Mr. Bradley who initiated and commissioned the 2006 audits that uncovered the systemic fraudulent inpatient and OBS practices at Shands, it would not be beyond the realm of reason to hypothesize that his decision to hire YPRO to  audit one-day stays and OBS led to his demise at Shands.

97.     Elizabeth White was named Chief Compliance Officer (CCO) at Shands in April, 2007.  She replaced Mr. Bradley.  Relator quickly observed that Ms. White brought a totally different perspective to the audits.  Ms. White's primary concern revolved around damage control and keeping the information from the YPRO audits contained.  Ms. White took great pains in her interaction with YPRO to make sure that the 2007 audit results would not be clearly divided into payor categories.

98.     Ms. White did not allow YPRO to share 2007 summary details or system-wide deficiencies with individual hospitals or employees.  Ms. White instructed YPRO to not show errors by specific payor such as Medicare or Medicaid although this information had been broken out and presented to Shands in the form of the 2006 executive summary discussed previously.

99.     Ms. White directed that the reports for the 2007 audit only show numbers and detail "in total" without any breakout by payor.  She did not want the 2007 audit to break out Medicare and Medicaid errors apart from other commercial payor categories.  This was a deviation from the instruction provided by Mr. Bradley for the 2006 audit.

100.    The payor-by-payor distinction regarding error rates was an integral part of the 2006 audit specifications.  However, Shands did not want that delineation between payor types to be a part of the 2007 YPRO audit.

101.    Ms. White required that the exit meetings between the hospital personnel and YPRO only involve a short face-to-face meeting with the coders or case managers (where applicable) to discuss only individual patient files as necessary.

102.    Shands did not want any error rates or accuracy rates to be shared regarding Medicare/Medicaid inpatient or observation errors.  However, YPRO did in fact collect this payor-specific information as a separate component of its 2007 audit regarding Medicare claims, but the results of the 2007 audit were to be "totaled" and not broken-out separately by Government Payors for the hospitals.  Relator has the Medicare-specific data.  This payor-specific data mined by YPRO has been provided to the Government by Relator.

103.    Relator considered the limiting requests from Ms. White to be very disturbing because this type of damage control was not consistent with the actions of a provider that was concerned with a good-faith system-wide review of its Medicare/Medicaid billings or its compliance programs.

104.    The findings of the 2006 audit were bad.  The findings of the 2007 audit were much worse.

105.    The 2007 audits at the same six Shands facilities occurred between mid-April and mid-May, 2007.  The preliminary results of the 2007 audits were submitted to Shands in late May, 2007.

106.    The 2007 audit included a RAT-STATS selection of Medicare patients which were combined with other payor types.  The entire record was audited by YPRO for medical necessity, CM protocol issue accuracy, as well as billing compliance accuracy and the number of units over-billed.

107.    The one-day stay errors at Shands increased between the 2006 audit and the 2007 audit.

108.    The medical necessity errors increased for most of the Shands hospitals from 2006 to 2007.

109.    The CM protocol issue errors showed a significant increase from 2006 to 2007.

110.    In 2007, just as in 2006, half of the Shands hospitals still had no CM protocols.

111.    The CM protocol issue accuracy decreased for two of the three hospitals that did attempt to utilize some form (albeit deficient) of CM protocols.  The billing compliance accuracy improved slightly, but was still well below industry standards.

112.    The 2007 audit also revealed an ascertainable deterioration in regard to the accuracy of OBS billings.  The number of units over-billed increased by 100% from 2006 to 2007!

27

113.    In 2007, a new and somewhat startling revelation came to the surface. Despite the fact that the number of units "over-billed" increased by 100%, the number of units "under-billed" decreased!

114.    These calculated results showed Shands' commitment to improving its billing accuracy only when the effort to change will result in the collection of more money. It also underscores the total failure of Shands to make a commitment to stop the systemic over-billing that was highlighted in the 2006 audit.

115.    The common denominator between decreasing your under-billing and increasing your over-billing is obvious – Shands continued to subordinate its compliance concerns to its efforts to increase revenue and profits. This conclusion is supported by the fact that from 2006 to 2007 the identified under-billings decreased while the identified areas of over-billing increased by 100%.

116.    Consider the following facts: The OBS billing compliance accuracy rates were abysmal in 2007. UF had a 58% error rate! STARKE had a 71% error rate! JAX had a 51% error rate! AGH had a 53% error rate! LAKESHORE had a 67% error rate! LIVE OAK had a 56% error rate! These error rates consider all payor types in one group. The rates for Medicare/Medicaid patients are much higher when broken out separately as quantified hereafter in paragraphs 123-126.

117.    An Executive Summary that outlined the 2007 audit was prepared and presented to Shands by YPRO in June, 2007. A Shands corporate meeting was held in Jacksonville, Florida.   Ms. Kirchoff was limited to a one-hour exit meeting with representatives of the six facilities.

118.    Six separate one-hour exit meetings were held, one after the other.  There was no break-out by Government Payors as per the new format required by the Shands CCO.

119.    However, in July, 2007, a spreadsheet was provided to Shands upper management which had not been shared with lower level Shands employees that was broken into two separate categories:  "Medicare" and "Commercial".  The latter category of "Commercial" is misleading as Medicaid, TriCare and Champus, as well as private payors, were lumped into the "Commercial" category as per the Shands CCO.

120.    The aforementioned spreadsheet, as well as a full Executive Summary for the 2007 audit and results of the 2007 audit on a Shands facility-by-facility basis was provided to Shands CCO.   A copy of these 2007 audit worksheets and records regarding the Medicare/Medicaid patient files and other payor files have been provided to the Government by Relator.

121.    As stated above, it is very telling that Shands improved their under-billed efficiency (which increased revenue) while increasing by 100% the number of units over-billed (which also increased revenue) at the expense of the Florida and United States taxpayers.

122.    Based upon the worksheets and the 2006 and 2007 audit information obtained by YPRO and provided to the Government, it is clear that the percentage of Medicare/Medicaid records with billing errors and problems is much higher than exists for commercial payors.  A comparison can be completed by breaking out the Medicare patients from commercial patients by studying the e-logs and spreadsheets prepared by YPRO.

123.    For example, Relator looked at the three largest Shands hospitals and determined error rates relating to improper one-day stays for Medicare and commercial payors.

124.    At UF, medical necessity errors are more than 200% higher for Medicare than for commercial payors.

125.    At AGH, Medicare medical necessity errors are 500% higher than for commercial payors.

126.    At JAX, Medicare medical necessity errors are 73% higher than for commercial payors.

127.    Early in 2008, Relator attempted to contact Elizabeth White about a follow-up audit to monitor any progress, or lack thereof, that had occurred within the Shands facilities. Ms. White did not respond to his voicemail.

128.    When Relator's calls were not returned, he sent an email to Elizabeth White. Within that email, he reiterated his previously expressed concerns from the prior 2006 and 2007 audits regarding the decrease in the accuracy for medical necessity from 2006 to 2007 applicable to inpatient one-day stays.

129.    Relator also reminded her that the CM protocol issue accuracy had significantly decreased from 2006 to 2007.

130.    Relator again informed her that half of the hospitals had no CM protocol whatsoever.

131.    Relator also reiterated to her the fact that the number of over-billed units increased by over 100% with regard to OBS services from 2006 to 2007.

30

132.    Relator noted the decrease in CM protocol issue accuracy for two of the three hospitals which did claim to have a CM protocol. Relator concluded that continuing monitoring was appropriate and he recommended another audit.

133.    Ms. White responded to Relator as follows: "Mr. Myers, I am presently at a conference and unavailable to discuss your concerns. In the future, I would appreciate your use of discretion in sending messages via email that contain any type of analysis/information related to our hospitals. As a professional, you should be aware that email communications are unsecure... the equivalent of sending a postcard. Thank you. Elizabeth". Shands' knowledge of the fraudulent conduct, as well as the motus operandi of its CCO, is a matter of record. These email exchanges have been provided to the Government by Relator.

134.    This message reinforced Relator's opinion that the primary concern of Shands was damage control. Shands was focused on trying to keep the YPRO audit findings to themselves. At this point, Relator became more convinced than ever that Shands had not made an appropriate full and candid self-disclosure as required by law and as recommended by Relator to Shands in January, 2007.

135.    Finally, on or about February 6, 2008, Relator called Ms. White by phone to ask about the needed follow-up audit and she stated that, "We have done some things internally. If we need an external audit, we will put out an RFP (request for proposal)".

136.    It was apparent to Relator that Shands wanted no further illumination or auditing of the fraudulent practices discovered in the 2006 and 2007 YPRO audits.

## 2007 CHARGEMASTER REVIEW

137.   At the end of May, 2007, YPRO received a contract for an audit of the Charge Description Master (CDM) for the six Shands hospitals.  A copy of the CDM contract has been provided to the Government.

138.   YPRO identified many significant issues with the Shands CDM, but one major problem that was detected led to the premature termination of the CDM review.

139.   Shands operated a Home Health Agency that was affiliated with the UF hospital.  At the start of its audit, YPRO discovered that Shands Home Health Agency (HHA) only had 49 valid line items on its CDM.

140.   This CDM was legally deficient.  The CDM was insufficient as a Charge Master for purposes of submitting bills to Medicare, Medicaid or any Government Payor.  Of the 49 charge lines reviewed, 16 services were assigned to codes that were either deleted or invalid.  These lines should have been reviewed for improper assignment of CPT/HCPCS or Medicaid codes.  Also, YPRO notified Shands that its CDM audit uncovered problems with improper billing of billable units.

141.   The YPRO contract called for an on-site Charge Capture Audit.

142.   When Relator and YPRO attempted to schedule the on-site audit, Junior Anchor, the CFO of the Shands HHA attempted to stop the audit.  He claimed that the HHA used "an outside company" to do their billing and that he (or the Shands HHA) did not have the records needed for the CDM audit.

32

143.    When YPRO called its Shands corporate contact about this representation, Shands indicated that they had no information to confirm the statement of the CFO for the HHA. Shands stated to YPRO that it was not aware of an "outside company" that was responsible for the billing for its HHA.

144.    When YPRO sent a consultant on-site, Junior Anchor arranged the meeting so that he personally met the YPRO consultant at the HHA site when the consultant and Mr. Anchor were the only people in the building. Mr. Anchor was very rude and antagonistic to her and he did not have the requested information ready or available for her audit. He indicated that he did not see the need for the HHA review.

145.    The YPRO consultant felt so uncomfortable with the treatment she received from Mr. Anchor that she left the building and refused to go back. Because there were additional indications available to YPRO apart from the records being protected by Mr. Anchor that significant billing problems existed at the Shands HHA, it was determined that a second consultant should attempt to complete the audit.

146.    The second consultant completed the line item audit, but Shands still could not get its HHA to schedule the on-site audit. Attempts to schedule the on-site audit went on for many weeks until ultimately YPRO was told by Shands that there was suddenly "no need" to do the audit. Shands retreated from its prior instructions and called off the HHA audit before it could be completed or even started in earnest.

147.    Relator felt that this was another example of the Shands management not being in control of its billing or compliance problems. He also felt that the CDM problems with the HHA were being covered up. Despite the fact that YPRO had already been paid to

do the on-site audit, Shands yielded to internal opposition from the CFO of its HHA and told YPRO there was "no need" to complete the audit that YPRO had been hired and paid to conduct.

148.    In sum, Shands was not aware that its HHA billing was being handled by a third party entity which was unrelated to Shands.  This total absence of institutional knowledge and control was something that Relator had never experienced before in his long health care career.  The actions of Shands violated the Government's requirement that Compliance programs be used to validate the legitimacy of charges made to Government Payors.

149.    If Shands was unaware that a third party was handling its home health billing and coding, how could Shands (or the Government Payors) have any level of comfort that the billing and coding applicable to Government Payors was being handled in a legal or appropriate fashion?  All of the billing and coding errors discovered by YPRO were detailed in the October 9, 2007 "Charge Description Master Review" provided to the Government by Relator.

150.    Finally, it is also important to note another fraud occurring at Shands.  The CDM audit showed that the Shands hospitals were billing for durable medical equipment (DME) without a DME license.  This illegal activity also proximately causes significant damage to the Government.  YPRO specifically explained this issue to Shands. Relator does not know if Shands made a voluntary disclosure to the Government concerning any of the CDM review findings of illegality.

34

## SUMMARY OF FRAUDULENT SCHEMES

151.    The purpose of the fraudulent actions described in this Complaint was to obtain unlawful and excess reimbursement by Medicare, Medicaid and TriCare/Champus as well as other private insurers. Defendants have submitted fraudulent claims for reimbursement in express violation of federal and state statutes, rules and regulations as described hereafter. The Shands defendants have engaged in the following intentional, unlawful and fraudulent activities:

I.      Failure to comply with  inpatient and observation  criteria required to bill Government Payors;

II.     Failure to comply with medical necessity inpatient criteria that must be met in order to bill Government Payors;

III.    Failure to maintain any legitimate compliance protocols or corporate oversight needed to ensure the accuracy of billings presented to Government Payors;

IV.     Failure to establish sufficient utilization review protocols required by Medicare as a condition of program participation;

V.      Failure to establish or maintain case management protocols needed to ensure the accuracy of billings presented to Government Payors;

VI.     Failure to comply with one-day stay criteria needed to establish medical necessity for inpatient admissions;

VII.    Failure to comply with requirements as to billable units regarding the calculation of time for patients admitted under observation status, which resulted in

overbilling;

VIII.   The adding of additional CPT codes on the UB-92 which were not appropriately coded by the HIM department;

IX.   Failure to comply with and/or obtain appropriate physician orders as to medical necessity of admissions, discharges and care of patient;

X.   As to the hospital-based home health agency of Defendant SHANDS TEACHING HOSPITAL AND CLINICS, INC. d/b/a "SHANDS AT THE UNIVERSITY OF FLORIDA", failure to use appropriate coding for purposes of billing Medicare/Medicaid and failing to obtain supporting documentation required for billing Government Payors;

XI.   Failure to make self disclosures in the time and manner required by law;

XII.   Failure to return overpayments and/or make adjustments for improper payments received from Government Payors;

XIII.   Failure to provide requisite oversight, monitor billings or implement compliance programs which combined to cause excess payments to be made by Government Payors and also caused the filing by Shands of false and misleading cost reports; and

XIV.   Failure to satisfy the obligations of the Board of Directors and Officers of Shands to assure that legitimate information and reporting systems are in place that provide accurate information regarding Government beneficiaries prior to billing any Government Payor.

XV.   Billing the Government for DME and related DME charges without a DME

36

license.

## COUNT I
### (Violation of False Claims Act 31 U.S.C. § 3729-33)

151.    Paragraphs 1 through 150 are incorporated into Count I as if fully set forth herein.

152.    This is a civil action brought by Relator on behalf of the United States against the Defendants under the Federal False Claims Act, 31 U.S.C. § 3729-33.

153.    The Defendants knowingly or reckless disregarded or in deliberate ignorance of the truth or the falsity of the information involved, presented or caused to be presented, false or fraudulent claims for payment to federally-funded health insurance programs, in violation of, inter alia 31 U.S.C. § 3729(a)(1).

154.    Further, the Defendants in reckless disregard or deliberate ignorance of the truth or the falsity of the information involved, made, used, caused to be made, or caused to be used, false or fraudulent records and statements to get false or fraudulent claims paid or approved, in violation of, inter alia 31 U.S.C. § 3729(a)(2).

155.    The Government Payors, unaware of the falsity of the claims and/or statements made or caused to be made by the Defendants, and in reliance on the accuracy of these claims and/or statements, paid for purported medical procedures and services provided to individuals insured by federally-funded health insurance programs, including Medicare and other Government Payors.  Had the United States known that the bills presented by Defendants for payment were false and misleading, payment would have not have been made for such claims.

156.    Additionally, Defendants have violated 31 U.S.C. 3729(a)(7) by knowingly making, using or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government.

157.    As a result of Defendants' actions, the Government Payors have been severely damaged.

## COUNT II
**(Conspiracy to Violate the False Claims Act 31 U.S.C. § 3729(a)(3))**

158.    Paragraphs 1 through 157 are incorporated into Count II as if fully set forth herein.

159.    The Defendants conspired with one another to get false and fraudulent claims allowed and paid by the Government Payors.

160.    The Defendants conspired together and later withheld information specifically known to Defendants regarding the fraudulent billing of patients.

161.    Accordingly, the Defendants acted in a concerted fashion to defraud the Government Payors, and the Defendants acted together in keeping the facts necessary to investigate the fraud and the damages caused by the fraud away from the United States. Accordingly, the Defendants violated 31 U.S.C. § 3729(a)(3).

162.    As a result of the Defendants' actions, the Government Payors have been severely damaged.

## COUNT III
### (Violations of the Florida False Claims Act Fla. Stat. § 68.082(2)(a))

163.    Relator restates and realleges the allegations contained in Paragraphs 1-162 above as if each were stated herein in their entirety and said allegations are incorporated by reference.

164.    The Florida False Claims Act, Fla. Stat. § 68.082(2)(a), specifically provides, in part, that any person who:

> (a)     Knowingly presents or causes to be presented to an officer or employee of an agency a false claim for payment or approval;

> . . .

> is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

165.    Defendants knowingly presented or caused to be presented to the Florida Medicaid program false claims for payment and approval in violation of Fla. Stat. § 68.082(2)(a).

166.    The State of Florida paid said claims and has sustained damages, to the extent of its portion of Medicaid losses from Medicaid claims filed in Florida, because of these fraudulent acts by the Defendants.

### Fla. Stat. § 60.082(2)(b)

167.    The Florida False Claims Act, Fla. Stat. § 68.082(2)(b), specifically provides,

in part, that any person who:

>    (b)    Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency;
>
>    . . .
>
>    is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

168.    Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by an agency of the State of Florida, in violation of Fla. Stat. § 68.082(2)(b).

169.    The State of Florida paid said claims and has sustained damages, to the extent of its portion of Medicaid losses from Medicaid claims filed in Florida, because of these fraudulent acts by the Defendants.

## Fla. Stat. § 68.082(2)(c)

170.    The Florida False Claims Act, Fla. Stat. § 68.082(2)(c), specifically provides, in part, that any person who:

>    (c)    Conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid;
>
>    . . .
>
>    is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the act

40

or omission of that person.

171.    Defendants conspired to submit a false claim to Government Health Care Programs and to deceive Federal/Government Health Care Programs for the purpose of getting false and fraudulent claims allowed and paid, in violation of Fla. Stat. § 680.82(2)(c).

172.    The State of Florida paid said claims and has sustained damages, to the extent of its portion of Medicaid losses from Medicaid claims filed in Florida, because of these fraudulent acts by the Defendants.

### Fla. Stat. § 68.082(2)(g)

173.    The Florida False Claims Act, Fla. Stat. § 68.082(2)(g), specifically provides, in part, that any person who:

> (g)    Knowingly makes, uses or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to an agency
>
> . . .
>
> is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

174.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, including without limitation, by failing to alert the state government or to pay the correct rebate amounts to Medicaid, in violation of Fla. Stat. § 680.82(2)(g).

175.    The State of Florida paid said claims and has sustained damages, to the extent

of its portion of Medicaid losses from Medicaid claims filed in Florida, because of these

fraudulent acts by the Defendants.

WHEREFORE, Relator prays for judgment against Defendants as follows:

(a)    That Defendants be ordered to cease and desist from submitting and/or

causing the submission of additional false claims or otherwise violating 31 U.S.C. § 3729-

33;

(b)    That judgment be entered in favor of the United States and Relator and against

the Defendants in the amount of each and every false or fraudulent claim multiplied as

provided by 31 U.S.C. § 3729(a), plus a civil penalty of not less than Five Thousand Five

Hundred and No/100 ($5,500.00) Dollars, and no more than Eleven Thousand and No/100

($11,000.00) Dollars per claim, as provided by 31 U.S.C. § 3729(a), to the extent such

multiplied penalties shall fairly compensate the United States of America for losses resulting

from the various schemes undertaken by Defendants, together with penalties for specific

claims to be identified at trial after full discovery; and

(c)    That Relator be awarded the maximum amount permissible according to 31

U.S.C. § 3730(d);

(d)    That judgment be granted for the United States of America and Relator and

against Defendants for any costs including, but not limited to, court costs, expert fees, and all

attorneys' fees incurred by Relator in the prosecution of this suit;

(e)    That judgment be granted in favor of the Relator and the State of Florida

against Defendants jointly and severally in an amount equal to three times the amount of

damages that Florida has sustained as a result of the Defendants' actions, as well as a civil penalty against the Defendants of a statutory maximum ($5,500 to $11,000) for each violation of Florida's state's FCA: Fla. Stat. § 68.082 et.seq.; and

      (f)    That the United States and Relator be granted such other and further relief as the Court deems just and proper.

Dated this 30th day of April, 2008.

WILBANKS & BRIDGES, LLP

By: _Marlan B Wilbanks_ _____
     MARLAN B. WILBANKS
     Trial Counsel
     Georgia Bar No. 758223

By: _Ty M. Bridges_ _____
     TY M. BRIDGES
     Georgia Bar No. 081500

3414 Peachtree Road, NE
Suite 1075
Atlanta, Georgia  30326
(404) 842-1075 (tel)
(404) 842-0559 (fax)
mbw@wilbanks-bridgeslaw.com
tmb@wilbanks-bridgeslaw.com

STUTSMAN THAMES & MARKEY, P.A.

By _____
        William L. Roelke, Jr.

Florida Bar Number 13923
50 North Laura Street, Suite 1600
Jacksonville, Florida 32202
(904) 358-4000
(904) 358-4001 (Facsimile)
wlr@stmlaw.net

44